UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
(Charlotte Division)

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| KLMKH, Inc., | ) | Case No. 22-30102 |
| | ) | |
| Debtor. | ) | |
| | ) | |

## MOTION TO DISMISS BANKRUPTCY CASE, OR ALTERNATIVELY, FOR RELIEF FROM STAY AND ADEQUATE PROTECTION

**NOW COMES** ARC LPW I LLC ("ARC"), by and through its undersigned counsel, who hereby submits this motion the ("Motion") and moves the Court to dismiss the above-captioned bankruptcy case for cause pursuant to 11 U.S.C. § 1112, or alternatively, for relief from the automatic stay under § 362(d)(1) and for adequate protection.

As further described below, KLMKH, Inc. ("KLMKH") received over $3.4 million from ARC and then almost immediately commenced a course of continued failures with respect to certain oil and gas field operations situated in Kansas. Serious operational and safety issues have been observed at the applicable fields, and there is no indication these untenable conditions have been sufficiently addressed. The apparent mismanagement has continued in this bankruptcy case (the "Case"), as evidenced by the voluntary petition for relief in the Case, Doc. No. 1 (the "Petition"), being filed the same day as a foreclosure sale without any of the required schedules, statements and other documents—even omitting the matrix of creditors and other interested parties who are affected by the Case. Perhaps most troubling is that KLMKH has failed to show it has adequate insurance notwithstanding the potentially dangerous conditions that persist at the fields. With all this in mind, ARC is compelled to submit this Motion notwithstanding KLMKH's alleged, but unsubstantiated, intention to pay the obligations owed to ARC in full.

157590550

**Background**

1. ARC provided volumetric production payment ("VPP") financing[1] to KLMKH in the amount of $3,425,000 on February 21, 2020 pursuant to that certain Volumetric Production Purchase Agreement dated as of February 20, 2020 (the "VPP Agreement"). A copy of the VPP Agreement is included as Exhibit A to the Declaration of Sam Hook filed in the Receivership Action (defined below) attached as Exhibit A hereto (the "Hook Declaration").

2. The VPP funding was provided to facilitate operations located in Leavenworth and Jefferson Counties, Kansas (respectively, the "Leavenworth Fields" and the "Jefferson Fields," and together, the "Fields"), where KLMKH was to extract oil under the auspices of certain lease agreements that give KLMKH the right to drill for oil in exchange for certain payments to the counterparties under the respective agreements (the "Leases").

3. KLMKH's obligations under the VPP Agreement are secured, in part, by the Leases and the proceeds of KLMKH's extraction operations pursuant to that certain Security Agreement in favor of ARC, a copy of which is included as Exhibit B to the Hook Declaration. ARC also has a recorded judgment lien in its favor with the District Courts of Leavenworth County, Kansas (the "Leavenworth County Judgment Registration") and

---

[1] VPP financing utilizes an oil production schedule for repayment of a loan. Companies that operate oil interests contend with financial uncertainty because, while they may expect a certain amount of monthly oil production out of certain assets, they cannot be certain what the price of oil will be in the future given the extreme volatility of oil prices. ARC invests in companies in the oil and gas industry, and offers up-front payment to parties with oil and gas interests in the form of a lump sum payment, in return for a guaranteed amount of oil produced each month. This arrangement limits the uncertainty faced by oil producers, and allows them immediate access to capital they otherwise would not have for years. For its part, ARC takes on the risk of future fluctuations in the price of oil, which it hedges through separate hedging investments based on a proprietary hedging model.

Jefferson County, Kansas (the "Jefferson County Judgment Registration") as respectively reflected in Exhibits B-1 and B-2 hereto based on the Stipulated Judgment (defined below).

4. Under the VPP Agreement, ARC assumed the risk of oil price fluctuations by requiring that KLMKH meet certain minimum oil production amounts over a sixty (60) month period as provided in Schedule I of the VPP Agreement instead of monetary payments. In turn, the VPP Agreement required that KLMKH deposit certain of the proceeds from the oil production in a designated deposit account (the "Designated Account"). VPP Agreement § 4.01.

5. However, despite receiving $3,425,000 in funding, KLMKH has not complied with the VPP Agreement's minimum production requirement for any month.

6. The VPP Agreement was amended in August 2020 (the "Amendment") whereby the production scheduled for March through June 2020 was replaced by a schedule of payments to be made from August through December 2020 totaling $336,904.10. A copy of the Amendment is included as Exhibit C to the Hook Declaration.

7. KLMKH made sporadic payments that were ultimately short of the amounts required in the Amendment's payment schedule. Further, KLMKH was unable to make its payroll for October 2020, and ARC funded KLMKH's payroll for November 2020. Hook Declaration at ¶¶ 15–17.

8. In a press release dated March 10, 2021, Orpheum Property, Inc. ("Orpheum"), a public company (OTC: PLFF), advised that Orpheum had entered into a reverse merger with KLMKH. The March 10, 2021 press release and certain other press releases are respectively attached as Exhibits C-1 to C-6 hereto (the "Press Releases").

**Receivership Action**

9. Due to KLMKH's operational issues, ARC filed an action to appoint a receiver on March 22, 2021 with the United States District Court for the Southern District of Texas, Case No. 4:21-cv-926 (the "Receivership Action").

10. Just prior to the Receivership Action, the parties agreed to retain the services of Davie Minyard to perform an independent operational audit of KLMKH's operations, which he conducted in March 2021. A copy of Mr. Minyard's Declaration (the "Minyard Declaration") and report (the "Minyard Report") filed in the Receivership Action is attached as Exhibit D hereto. The operational issues observed by Mr. Minyard are summarized below:

11. Environmental Issues: [2]

   a. Oil spills with no or inadequate remedial measures.

   b. Nonexistent or ineffective spill prevention and cleanup practices.

   c. Improperly sized or equipped production equipment, resulting in leaks and spills occurring on a regular basis.

   d. In his professional opinion, Mr. Minyard believed that a significant environmental event was likely if KLMKH did not take corrective action, which could likely include land contamination and/or leaking onto adjacent properties not owned or leased by KLMKH.

12. Health and Safety Issues: [3]

   a. Hydrogen Sulfide was present on part of the field without any warning signs. Hydrogen Sulfide is a dangerous substance that can cause serious sickness or even kill those exposed to it.[4]

---

[2] Minyard Declaration at ¶¶9–12.
[3] Minyard Declaration at ¶¶13–18.
[4] The Occupational Safety and Health Administration has explained that "Hydrogen Sulfide (also known as H2S, sewer gas, stink damp, and sour damp) is a colorless gas known for its pungent

157590550

    b. Basic safety clothing (*e.g.*, hard hats, safety glasses, personal H2S (Hydrogen Sulfide) monitors, etc.) required by OSHA was nonexistent.

    c. KLMKH was operating an oil field next to a city without an Emergency Response Plan ("<u>ERP</u>"), and an effective ERP is necessary to notify emergency responders in the event of an emergency. The lack of such an ERP represented a health and safety risk to the general public.

    d. Pumping unit belt guards had been removed, leaving personnel exposed to moving belts, sheaves, and exposing loose clothing to accidental entanglement.

    e. These conditions, taken together, posed a significant risk of injury to people on the Fields.

13. <u>Personnel Issues</u>: [5]

    a. KLMKH's field personnel had left their employment due to compensation disagreements with KLMKH, including its former Field Superintendent (Jim Goad) and Lease Operator (Tom Hutchins). KLMKH's field personnel at the time of the Minyard Report consisted of one water truck driver, Jake Kerr, who was attempting to manage all field activities, and Mr. Kerr lacked experience in dealing with health and safety issues. Mr. Kerr was working seven days a week (including late hours and night field trips) with no relief.

---

'rotten egg' odor at low concentrations.  It is extremely flammable and highly toxic. . . . Hydrogen sulfide is one of the leading causes of workplace gas inhalation deaths in the United States." *See* https://www.osha.gov/hydrogen-sulfide (last visited March 28, 2022).
[5] Minyard Declaration at ¶¶19–21.

157590550

    b. KLMKH had not successfully hired any experienced personnel to replace those it had terminated, nor had it rehired any such personnel.

    c. Mr. Minyard doubted KLMKH's ability to retain experienced personnel to operate the Fields under current management, given the limited labor pool in the area and KLMKH's payment disputes that led to prior employees leaving their employment.

14. Vendor Issues:[6]

    a. KLMKH had delinquent balances with several of its vendors, and many vendors were refusing to perform work on the Fields including:

        i. Heartland Compression, which provided compression services.

        ii. Hampel Oil Inc., which provided lubrication oil necessary for the compressors.

        iii. Hi-LA Pump and Supply & Sunrise Pump and Supply both provided general supplies had shut down KLMKH accounts and were refusing to provide services under current management.

        iv. Freestate Electric & Evergy Electric had shut down power due to nonpayment.

        v. BGD Services, LLC ("BGD"), which provided oil service rigs and project assistance had filed liens against KLMKH for nonpayment and was refusing to work.[7]

---

[6] Minyard Declaration at ¶¶28–33.
[7] As noted below, ARC subsequently acquired BGD's liens.

157590550

      b. These vendors had indicated that they had lost trust in KLMKH's management team, especially in receiving timely payment for services rendered.

15. <u>Other Production Issues</u>:[8]

      a. Mr. Minyard found that KLMKH Production Reports appear to be incomplete and potentially inaccurate.

      b. Well and lease records are not organized and the few that were present did not contain sufficient information to evaluate the current well status or potential.

16.     In sum, based on Mr. Minyard's professional opinion, KLMKH was operating the Fields in an unsafe manner (presenting both environmental risks and health and safety risks), KLMKH lacked adequate personnel or vendors to allow the Fields to operate effectively, and the risk of a serious health or environmental event was high under the current management.

17.     In its brief in the Receivership Action, Doc. No. 20 (the "<u>KLMKH Brief</u>"), KLMKH initially represented that it was producing 70 barrels of oil per day as of April 19, 2021. KLMKH Brief at 9. However, KLMKH qualified this representation in its surreply memorandum filed in the Receivership Action, Doc. No. 24 ("<u>KLMKH Surreply Brief</u>") to say the 70 barrel/day figure was an estimate based on two days of production, KLMKH Surreply Brief at 4, Doc. No. 24-1 at 1–2, after ARC pointed out in its reply brief filed in the Receivership Action that the 70 barrel/day estimate appeared to be detached from reality. Receivership Action, Doc. No. 21 at 5.

---

[8] Minyard Declaration at ¶¶13–18.

157590550

18. Notably, the July 1, 2021 Press Release, attached as <u>Exhibit C-2</u> hereto, forecasted that production would be 100 to 120 barrels/day by the end of the second quarter, but KLMKH's current output at the time was between 30 to 50 barrels/day.

19. The Receivership Action ended pursuant to a June 7, 2021 stipulated order and judgment in the face amount of $4,667,880.[9] Receivership Action, Doc. No. 29 (the "<u>Stipulated Judgment</u>").

**Events After Stipulated Judgment**

20. To date, KLMKH has not provided any specifics as to what extent the issues detailed in the Minyard Declaration and Report have been addressed.[10]

21. The July 1, 2021 Press Release alluded to "recently initiated" modifications to existing infrastructure and processes, but it is otherwise unclear what the Press Release refers to. Subsequent Press Releases describe endeavors related to cryptocurrency or allude to KLMKH's difficulty with satisfying the Stipulated Judgment.

22. Notably, in September 2021, ARC acquired the mechanics liens of BGD, one of KLMKH's now former vendors, to prevent a foreclosure under the liens (the "<u>Vendor Liens</u>").[11]

---

[9] In addition to principal credit amounts extended under the VPP Agreement, the amount of the Stipulated Judgment includes ARC's attorneys' fees and compensation for hedging losses ARC experienced as a result of KLMKH's failure to deliver promised payments for an early buyout request concerning the VPP Agreement. Hook Declaration at ¶¶ 6–10.

[10] In the KLMKH Brief (defined below), KLMKH stated that it needed more time to investigate the concerns raised in the Minyard Report. Nevertheless, KLMKH stated that it had resolved many of the issues described in the Minyard Report and was planning on upgrading its equipment. KLMKH Brief at 9–10. Yet, ARC was provided with no further specifics as to what corrective measures KLMKH had taken.

[11] ARC notes that it ultimately initiated foreclosure proceedings with respect to the Vendor Liens in December 2021.

23. On December 21, 2021, orders were entered that permitted ARC to notice foreclosure sales with respect to the Fields based on the Stipulated Judgment (the "Sale Orders"), Case No. 2:21-mc-00210-JWL-JPO (D. Kan.), Doc. Nos. 8 and 9.

24. The December 23, 2021 Press Release, attached as Exhibit C-4 hereto, referenced the Sale Orders.

25. On February 14, 2022, foreclosure sales were noticed for the Leavenworth Fields and Jefferson Fields for March 10 and March 15, 2022, respectively.

26. The Petition was filed on March 10, 2022.

27. The March 11, 2022 Press Release, attached as Exhibit C-5 hereto, describes an October 2021 published release reporting that "the Company" had "contracted to receive $25,000,000 in XUSD tokens, offset by a Convertible Note for the tokens being developed by the Company." According to the Press Release, the Company had been marketing 31,911 XUSD tokens it received in late 2021, and the Company sold 5,000 XUSD tokens to a "related party" in early 2022 in exchange for a "Promissory Note" of $5,000,000. However, the Press Release goes on to say that the XUSD tokens had been replaced by RoRa tokens in an amount equal to $20,000,000. The Press Release says the RoRa tokens are more reliable but their value will not be established until mid-year after the RoRa tokens enter the public market. The March 11, 2022 Press Release stated that the XUSD and RoRa tokens came from the same issuer. However, as a correction to the March 11, 2022 Press Release, the March 23, 2022 Press Release, attached as Exhibit C-6 hereto, advised that RoRa Corp. had no relation or affiliation with XUSD Blockchain Holdings and has no contracts or other agreements using XUSD coins.

**Bankruptcy**

28. The March 11, 2022 Press Release advises that KLMKH intends to pay the Stipulated Judgment in full within 60 days of the Petition.

29. KLMKH included certain financial and cash flow information with its Petition, and it does not appear any of the cryptocurrency assets (described in the Press Releases as being worth millions of dollars) are assets of KLMKH. Petition, Doc. Nos. 1-2, 1-3, 1-4.

30. KLMKH otherwise commenced this case without the required schedules, statements and other documents. Notice of Deficient Filing, Doc No. 4.[12]

31. KLMKH has been ordered to appear and show cause why this case should not be dismissed for failure to file the required list of creditors who are affected by this Bankruptcy Case. Order to Appear and Show Cause, Doc. No. 6.

32. Further, upon information and belief, KLMKH's operational issues have persisted in the Bankruptcy Case as KLMKH experienced a serious leak with respect to certain of its equipment the week of March 20, 2022 that remains unaddressed.

33. KLMKH has failed to provide proof of adequate insurance to the Bankruptcy Administrator and subchapter V trustee. See Response in Support of Court's Order to Appear and Show Cause for Dismissal of Case for Failure to Provide Proof of Adequate Insurance (the "Bankruptcy Administrator's Dismissal Motion"), Doc. No. 11 at 2.

34. The proceeds of KLMKH's oil field operations, to the extent there are any, would be cash collateral of ARC subject to 11 U.S.C § 363. As of the filing of this Motion, KLMKH has not sought ARC's consent for the use of cash collateral nor has ARC given any such consent.

---

[12] The deadline for KLMKH to file the required documents expired March 24, 2022. ARC notes that KLMKH has a pending request for an extension of the deadline to file the schedules, statements and other required documents, Doc. No. 13, that advises KLMKH's counsel received the information for the required documents the day before such required documents were due.

157590550

35.     As of this Motion, ARC is not aware of any indication that the issues described in Minyard Declaration and Report have been addressed or that the Fields are being operated in an acceptable manner.

## Basis for Relief

### Dismissal for Cause

36.     Pursuant to Bankruptcy Code Section 1112, a chapter 11 case may be converted to a case under chapter 7 or dismissed for "cause," whichever is in the best interests of creditors and the estate. Here, in light of the issues described above, ARC submits that it would be inappropriate to convert this case to a case under chapter 7 and saddle a chapter 7 trustee with the environmental and safety burdens of the oil fields in question. As such, dismissal should result where "cause" exists under § 1112 with respect to this Case.

37.     The non-exhaustive instances of "cause" specified under § 1112(b)(4) include the failure to maintain appropriate insurance that poses a risk to the bankruptcy estate and the failure to comply with an order of the court. The Court's Chapter 11 Subchapter V Small Business Operating Order, Doc. No. 2 (the "Operating Order"), required, among other things, that KLMKH provide the Bankruptcy Administrator and appointed subchapter V trustee in this Case with proof of adequate insurance within 10 days of the Petition.

38.     If KLMKH is operating, or attempting to operate, an oil extraction business, insurance is not optional. Moreover, in light of the issues observed in the Minyard Report, there is a particularly acute need for sufficient documentation of insurance immediately. Based on the representations in the Bankruptcy Administrator's Dismissal Motion, KLMKH does not have adequate insurance or has not otherwise provided sufficient documentation of adequate insurance, and the Case should be dismissed.

39. As far as ARC can tell from the limited available information, KLMKH is generating little to no cash from its operations. However, to the extent meaningful cash collateral of ARC exists, the use of any such cash collateral without ARC's consent or otherwise pursuant to this Court's order constitutes a basis for dismissal.

### Relief from Stay & Adequate Protection

40. Alternatively, if the Court believes this case should not be dismissed, ARC submits that, in light of the circumstances described above, ARC's security interests are not adequately protected, and that "cause" exists under 11 U.S.C. § 362(d)(1) for ARC to be granted relief from stay to send its own professionals to the Fields for inspection and for ARC otherwise to be granted replacement liens on any post-bankruptcy accounts, payment intangibles and other receivables.

41. Lastly, ARC notes that this Motion is based on ARC's knowledge leading up to the Petition and the limited information provided thus far by KLMKH in the Case and that ARC reserves the right to assert additional bases for dismissal, relief from stay, adequate protection or other relief as appropriate.

**WHEREFORE**, the ARC respectfully requests that the Court enter an order dismissing this Case, or alternatively, granting ARC relief from stay to send its own professionals to the Fields for inspection and that ARC be granted replacement liens on any post-bankruptcy accounts, payment intangibles and other receivables as well as the proceeds thereof as adequate protection. ARC further requests such other, further relief as is just, reasonable and proper.

[*remainder intentionally blank; signature follows*]

157590550

Dated: March 28, 2022

/s/ Ethridge B. Ricks
Ethridge B. Ricks
N.C. State Bar No. 48046
MCGUIREWOODS LLP
201 North Tryon Street, Suite 3000
Charlotte, NC 28202
Telephone: 704.343.2000
Fax: 704.343.2300
E-mail: bricks@mcguirewoods.com

*Counsel for ARC LPW I LLC*

157590550