# **Exhibit A**

Hook Declaration

[*documentation for Exhibit follows*]

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ARC LPW I LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 4:21-cv-926 |
| | ) | |
| v. | ) | |
| | ) | |
| KLMKH, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF SAM HOOK

I, SAM HOOK, declare as follows:

1. I am the EVP – Pricing and Analytics for Appalachian Royalty Co. ("ARC"). This declaration is based on my personal knowledge, and if called upon to do so, I could and would testify competently thereto. In connection with my position at ARC, I was heavily involved in ARC's communications with KLMKH during the course of the parties' interactions, including as described more fully below. I am also familiar with ARC's business records relating to this relationship, including financial records relating to KLMKH.

2. ARC invests in companies in the oil and gas industry, including through Volumetric Production Payment ("VPP") agreements. A VPP Agreements offer up-front payment to parties with oil and gas interests in the form of a lump sum payment in return for a guaranteed amount of oil produced each month. This arrangement limits the uncertainty faced by oil producers and allows them immediate access to capital they otherwise would not have for years. For its part, ARC takes on the risk of future fluctuations in the price of oil, which it hedges through separate hedging investments based on a proprietary hedging model.

1

3. In or about early 2020, KLMKH and ARC began negotiating a VPP agreement, and ultimately executed a VPP agreement (the "Agreement") on or about February 20, 2020. The terms of the Agreement required ARC to provide $3,425,000 in immediate funds to KLMKH in exchange for KLMKH's promise to provide "Assignee Production Payments" for specific quantities of oil on a monthly basis according to a Production Schedule agreed to by the parties. A true and correct copy of the VPP Agreement is attached hereto as **Exhibit A**.

4. ARC did in fact provide $3,425,000 in funding to KLMKH shortly after the parties' executed the Agreement.

5. To secure its promises under the VPP Agreement, KLMKH executed a separate "Security Agreement," on February 21, 2020, which includes several provisions relevant here. For example, KLMKH granted ARC a lien and security interest in all of KLMKH's right, title, and interest in, to and under all of its assets and property, including but not limited to specific "Collateral" described more fully in the Security Agreement. A true and correct copy of the Parties' Security Agreement is attached hereto as **Exhibit B**.

6. Within a few months after entering into the VPP, KLMKH requested that ARC agree to a buyout, through which KLMKH would agree to pay a sum certain to relieve it from its obligations under the Agreement. I was personally involved in those discussions.

7. Although the VPP expressly excused ARC from honoring a buyout request within the first six months of the term of the Agreement, ARC nonetheless agreed to accommodate KLMKH's request upon receipt of a wire of funds sufficient to complete the buyout.

8. KLMKH provided multiple assurances that the funds were in transit, yet they never arrived.

2

9. In fact, the funds were not in transit and never arrived, and no buyout agreement was ever consummated.

10. Notwithstanding that the Buyout agreement was not consummated, based on the assurances it received from KLMKH that funds would arrive imminently, ARC adjusted its hedge investments in reliance on KLMKH's promises. When the buyout funds did not arrive, ARC suffered substantial losses.

11. Once it became clear that the buyout was not going to be completed, and because KLMKH had already fallen behind on promised payments, the Parties agreed to amend the VPP Agreement production schedule to put KLMKH on a payment plan for "Additional Payments" to address KLMKH's outstanding delinquencies. A true and correct copy of the Amendment is attached hereto as **Exhibit C**.

12. Following the execution of the Amendment, KLMKH continued to miss both the promised "Additional Payments" payments and its regular production payments under the Amendment.

13. KLMKH made repeated assurances (including to me directly) that payment was forthcoming or in transit, often citing delays at its banks, but the funds did not arrive and KLMKH never cured its delinquency.

14. On behalf of ARC, I received banking information on several occasions (including federal reference numbers for purported wire transfers) from KLMKH sent to me to confirm pending payment from KLMKH. I now believe that information was falsified.

15. KLMKH further advised ARC (including me directly) that it was not in a position to make October 2020 payroll and would lay off some or all of its workforce.

3

16. To assist KLMKH with its financial difficulties, ARC agreed (at KLMKH's request) to fund KLMKH's payroll period expenses during the month of November 2020, based on KLMKH's promise that it would reimburse ARC. To date, ARC has not received reimbursement for these expenses from KLMKH.

17. Around the same time, KLMKH also advised me that it failed to pay its electricity bills and power was shut off to many of the leases on the field.

18. On November 9, 2020, I (on behalf of ARC) sent written Notice of Default to KLMKH pursuant to section 13.12 of the VPP Agreement. A true and correct copy of the Notice of Default is attached hereto as **Exhibit D**.

19. As of the date of the Notice of Default, KLMKH had failed to remit Production Payments which were due for September, October, and November and had also failed to pay the "Additional Payments" set forth in the Amendment for August, September, October, and November. KLMKH never cured its default and has continued to miss monthly payments due up until the filing of this lawsuit.

20. Following the Notice of Default, the parties engaged in protracted negotiations over a period of several months to see if a mutually agreeable agreement could be achieved to resolve KLMKH's defaults and delinquencies. However, the parties were unable to come to an agreement.

21. As part of those negotiations, the parties agreed to retain the services of Davie Minyard to perform an independent operational audit of KLMKH's operations, which he conducted earlier this month, March 2021. While the parties agreed to engage Mr. Minyard's services and both agreed that doing so would be beneficial, KLMKH claimed it did not presently have funds to pay for the services itself. The parties agreed therefore, that ARC would pay for Mr.

Minyard's services up-front, but would be reimbursed at a later date by KLMKH. To date, ARC has not received reimbursement for funds expended retaining Mr. Minyard's services.

22. Based on my communications with KLMKH vendors, I understand that KLMKH has lost the trust of many such vendors. For example, BGD, the main service provider for KLMKH sent an email to KLMKH management on which I was copied explaining his belief that they had misrepresented oil production and its readiness for pickup and sale.

23. In addition, I have come believe that KLMKH may have lost certain leases on the field. ARC was promised production payments from those leases and has not received them. The failure to produce oil on active leases may result in forfeiture of leasehold rights. In my experience, the failure of a producer to make such payments suggests that they may have title issues with the leases in question, possibly resulting from a failure to produce on those leases.

24. On March 19, 2021, ARC (through its counsel) sent a second Notice of Default pursuant to section 13.12 of the VPP. A true and correct copy of the second Notice of Default is attached hereto as **Exhibit E**.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 31, at Pittsburgh, Pennsylvania

BY: _____

Sam Hook

5